# MARDER v. DEY.

PATENTS; INTERFERENCE; BURDEN OF PROOF.

1. The fact that the application of one of the parties to an interference was not filed until after the grant of a patent to the other party imposes upon him a heavy burden of proof.

2. In an interference involving an improvement in time-recording devices whereby impressions on the records produced are printed in different colored inks, where the evidence of the junior party in support of his contention that a machine constructed by a time-recording company constituted his reduction to practice merely showed that while manager of a foundry company he had suggested to a representative of the former company that a two-colored ribbon device similar to that employed in adding and typewriting machines be adapted to a time indicator, and had furnished him a two-colored typewriting or adding-machine ribbon to facilitate the delivery to him of a time recorder with the two-color ribbon feature, and it appeared that the junior party made no claim to the invention until instigated to do so by the time-recording company more than a year after the construction of the machine, and that he assigned his rights to that company, it was *held* that the senior parties, to whom a patent had been issued before the junior party's application had been filed, were entitled to an award of priority. (Following *Mergenthaler* v. *Scudder*, 11 App. D. C. 264, and *Burson* v. *Vogel*, 29 App. D. C. 388.)

No. 549. Patent Appeals. Submitted January 14, 1909. Decided March 2, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are stated in the opinion.

*Mr. J. Edgar Bull* for the appellant.

*Messrs. Duell, Warfield & Duell* for the appellees.

Mr. Justice Robb delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents awarding priority of invention to the senior parties and patentees in an interference proceeding.

The subject-matter of the interference is a clock-controlled time recorder, which registers the time of arrival and departure of employees by impressions on cards. Formerly such recorders printed in a single color. This invention records late arrivals and early departures in a different colored ink from that in which regular arrivals and departures are printed, and thereby enables those reading the items to segregate the late-arrival and early-departure items from others, much more expeditiously than formerly. The issue is set forth in the following counts:

"1. A clock-controlled time recorder, comprising time-printing mechanism adapted to print records of different classes in distinctive impressions.

"2. A clock-controlled time recorder, comprising time-printing mechanism adapted to print records of different classes with the colors of the impressions distinctive of each class.

"3. A time recorder, including in combination time-controlled marking-devices, means for producing records therefrom, and means whereby records of different classes are made by marks having distinguishing characteristics.

"4. A time recorder, including in combination time-controlled marking-devices, means for producing records therefrom, and means whereby records of regular and irregular character are made by marks having distinguishing characteristics.

"5. A time recorder, including in combination time-controlled marking-devices, means for producing records therefrom, and means whereby records of different classes are made by marks having distinguishing characteristics.

"6. A time recorder, including in combination time-controlled marking-devices, means for producing records therefrom, and means whereby records of regular and irregular character are made by marks having distinguishing characteristics."

The application of John Dey and Alexander Dey was filed

November 15, 1904, and a patent was issued thereon March 28, 1905.

Walter S. Marder's application was not filed until May 5, 1905, which fact imposes upon him a heavy burden of proof. There are other circumstances connected with the case which tend to increase rather than diminish that burden.

The machine which Marder claims constituted his reduction to practice was constructed by the International Time Recording Company (hereinafter called the International Company) about December 1, 1903. Marder, at that time and subsequently, was manager of one of the foundries of the American Type Foundry Company. He made no application for a patent until instigated to do so by counsel for the International Company, and executed the application after having executed a license and royalty agreement under the terms of which the company was to have the exclusive license to manufacture under any patent which might issue on the application. The record further discloses that that company now controls the Dey & Dey patent.

We will first consider the evidence upon which Marder's application is based. As above stated, he was a manager for the American Type Foundry Company, but he was not a mechanic. As such manager it became his duty to purchase time recorders, and representatives of both Dey & Dey and the International Company attempted to secure his order. In 1901 Marder says he told Mr. Hogue, who was then an agent for the Dey Company, that he would not be satisfied with any time recorder which did not give him a record on an individual card, and "a distinguishing mark so that the employees who came in late or left early could be readily ascertained." The witness was asked whether he disclosed to Hogue how to provide for these distinguishing marks, and replied: "I do not recollect that anything was stated in the conversation with Mr. Hogue as to the exact means of providing for those distinguishing marks, other than the insertion of a two-color ribbon in the time recorder." Witness also testified relative to conversations with S. W. McLean, a representative of the International Company. Asked to state when these conversations occurred and the circumstances of them, the witness answered: "The conversations with McLean took place some

time in October or November, 1903," and that they were practically the same as the conversations with Hogue. Witness further testified that he sent a two-colored type writing or adding-machine ribbon to McLean "to facilitate getting the two-color ribbon feature on time recorders." Asked how this was to facilitate the matter, the witness replied: "My recollection of it is that Mr. McLean agreed to get his company to experiment on a two-color ribbon device, and that one objection that the factory brought up was that the two-color ribbon could not be obtained without a good deal of expense, and I thought by getting a ribbon which I knew was used at that time on typewriting machines and on adding machines, that it would hurry along the delivery of a time recorder with the two-color ribbon feature." Asked whether he disclosed to McLean any means for moving or shifting the two-colored ribbon, the witness answered: "Yes, I told McLean that the matter of shifting the ribbon to give the distinctive impressions ought not to be hard for any mechanic, as a similar shifting device was in use at that time on typewriters and adding machines."

We reproduce the following questions and answers from the cross-examination of the witness:

*Q.* Now, as I understand your statement as to the way in which you made this invention, it is that you conceived the idea that it would be a good thing to equip a time recorder with a two-color ribbon, that you disclosed this idea to several persons, stating to one in particular that the matter of shifting the ribbon to give distinctive impressions ought not to be hard for any mechanic, and that thereafter the company of which the party to whom you made this statement, to wit, one McLean, was a representative, delivered at your factory a construction such as that shown in "Exhibit No. 8;" is that correct?

*A.* Yes.

*Q.* And you never made any drawings of the structure?

*A.* No.

*Q.* Nor any further disclosure as to the means of carrying our your idea, beyond what you have already stated?

*A.* No.

McLean was called as a witness for Marder, and his testimony was substantially in accord with that above detailed.

H. E. Bundy, treasurer and general manager of the International Company, was also called as a witness for Marder, and on cross-examination was asked whether Marder in any way supervised the construction of Marder's exhibit machine, and answered in the negative. He was asked: "Was there anything peculiar about this ribbon (furnished by Marder), or was it the ordinary type such as is used for example in typewriting?" and replied: "It was the ordinary type."

He was further asked whether Marder gave instructions as to the manner of using the ribbon or the method of mounting it, and replied in the negative. Whereupon the following occurred:

Q. I gather from your preceding answers, then, that Mr. Marder, in the use of card machines, decided that it would be highly useful to print regular and irregular records in different colors in order to distinguish between the same more clearly, and merely communicated his views as above to your company, with the request that you evolve for him an efficient card time recorder having these characteristics; is this true?

A. That is true.

Q. In other words, and in order to make this clearer, he merely communicated to your company the object sought, and left the rest with you; is that true?

A. That is true?

Time-recording devices, to which this invention applies, are of entirely different construction than either adding or typewriting machines, and it by no means follows, that because one has conceived the idea of adapting a two-colored ribbon device similar to that employed in adding and typewriting machines to a time indicator, that he has made an invention. It might have seemed to an inexperienced person like Marder that the mere suggestion of the result desired was sufficient to enable any mechanic skilled in the art to bring about that result. In

this we think he was mistaken. Since the burden of proof rests upon him it must clearly appear that his discovery had passed the speculative and experimental stage and reached the point of consummation. "The law requires not conjecture, but certainty." *Coffin v. Ogden,* 18 Wall. 120, 21 L. ed. 821.

We are far from satisfied that the mere suggestion that a device attached to an entirely different mechanism be added to a time recorder completed the invention, and, unless the invention was complete, Marder "was inventing, *but had not invented,* and he must have invented before the law will come to his protection." *Mergenthaler v. Scudder,* 11 App. D. C. 264. "Invention consists of the conception of the idea *and of means for putting it in practice and producing the desired result." Burson v. Vogel,* 29 App. D. C. 388.

Moreover, the fact that Marder made no claim to this invention until instigated to do so by the International Company, a year and four months after the construction of the machine which he claims as his reduction to practice, is a circumstance not calculated to remove the doubt already existing. It is inconceivable, if Marder's conception was complete, that he should have taken no greater interest in the construction of the first machine embodying his idea, and that he should have neglected to make claim to the invention.

We conclude that the Commissioner was right in ruling that Marder's conception embraced merely the result desired, "without any definite idea of the manner in which the same could be accomplished." This conclusion disposes of the case, since it leaves Marder without standing in the Patent Office.

The decision of the Commissioner of Patents is affirmed, and the clerk of this court will certify this opinion and the proceedings in this court to the Commissioner, as required by law.

*Affirmed.*